# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

In re,

Ronald Jefferson Davis, Jr.,

Debtor.

Andrew Taylor and Naomi Taylor,

Plaintiffs,

v.

Ronald Jefferson Davis, Jr.,

Defendant.

C/A No. 11-07525-dd

Adv. Pro. No. 12-80034-dd

Chapter 7

**ORDER**

This adversary proceeding comes before the Court on the amended complaint of the plaintiffs, Andrew Taylor and Naomi Taylor ("Plaintiffs"), seeking a determination that a debt owed to them by the debtor and defendant, Ronald Jefferson Davis, Jr. ("Defendant") is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). Jurisdiction for this proceeding is premised upon 28 U.S.C. §§ 1334 and 157(a). This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I). Venue of this adversary proceeding is proper pursuant to 28 U.S.C. § 1409.

Defendant, proceeding *pro se*, answered the complaint and counterclaimed. At a hearing on October 9, 2012, the parties agreed the counterclaims asserted by Defendant were not compulsory in this case. The counterclaims were thus stricken from Defendant's answer and not pursued as part of this adversary proceeding. (Docket # 131). A trial was held on the 26th, 27th, and 28th of March 2013. After careful consideration of the applicable law, arguments of the parties, and evidence submitted, the Court issues the following findings of fact and conclusions

1

of law under Federal Rule of Civil Procedure 52(a), made applicable by Federal Rule of

Bankruptcy Procedure 7052.[1]

## FINDINGS OF FACT

### A. Background

1.      Plaintiffs are residents of the State of Georgia.

2.      Defendant is a resident of Charleston County, South Carolina.

3.      On December 5, 2011, Defendant, proceeding *pro se*, filed a voluntary petition for

relief under chapter 7 of the Bankruptcy Code.  Defendant's bankruptcy case is captioned *In re*

*Ronald Jefferson Davis, Jr.*, Case No. 11-07525-dd, and is pending in the United States

Bankruptcy Court for the District of South Carolina.

4.      Defendant received a discharge in his bankruptcy case on October 10, 2012.

However, this discharge does not apply to debts that this Court determines are excepted from

discharge.

5.      Defendant is a licensed attorney in Georgia.

6.      Naomi Taylor is a professor of radiology and nuclear medicine at a university in

Atlanta, Georgia and chief of nuclear medicine at a Veterans Administration medical center.

Andrew Taylor served as a co-director of nuclear medicine at a university in Atlanta, Georgia

and is currently employed at that university.

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are also so adopted.

7.      Naomi Taylor's daughter is married to David Pemberton.  Defendant was a close friend of Pemberton and best man at the wedding of Naomi Taylor's daughter and Pemberton in 2001.  Plaintiffs met Defendant through Pemberton prior to the wedding in 2001.

8.      Within a few years of the wedding, Defendant prepared a will for Plaintiffs while he was employed at Stillpoint Advisers ("Stillpoint") in Atlanta, Georgia.  Stillpoint provided wealth management and professional services.

9.      Eventually, Defendant left Stillpoint and started Apogee Family Office, LLC. Other companies later developed as part of the Apogee group of companies, including Apogee Law Collier, P.C.; Apogee Law Davis, Collier, LLC; Apogee Holding Company, LLC; Apogee Insurance Services, LLC; Apogee Wealth Management, LLC; Apogee CPA Services, LLC; Family Office 360, LLC; ATS Fidelis Group, Inc.; 1842 Capital, LLC; and Apogee GBC 2008, LLC (collectively referred to herein as the "Apogee Companies").

10.     In his answer, Defendant denies any principal relationship or managerial authority related to Apogee Law Collier, P.C.  He admits he was managing member for Apogee Family Office, LLC; Apogee Holding Company, LLC; Apogee Insurance Services, LLC; Apogee Wealth Management, LLC; Family Office 360, LLC; and 1842 Capital, LLC.  He also admits he was a member of Apogee CPA Services, LLC and Apogee Law Davis, Collier, LLC and a shareholder and officer of ATS Fidelis, Inc.

11.     Defendant testified he owned over 90% of Apogee Family Office, and there was one other owner of the company.

12.     Pemberton suggested Plaintiffs seek financial management advice from Defendant and the Apogee Companies.

13.     Plaintiffs' priority was retirement planning when they began receiving financial advice from the Apogee Companies around 2006.

14.     One of the services the Apogee Companies offered involved having access to clients' financial accounts and paying bills on their behalf.  Plaintiffs used this service.

15.     The Apogee Companies had access to Plaintiffs' IRA accounts and could withdraw fees for their services from those accounts.

**B. The Georgian Bank Stock Purchase**

16.     In 2008, Defendant became aware of a large block of Georgian Bancorporation, Inc. ("Georgian Bank") stock being sold at a discount by an investor who was having financial difficulties.

17.     Georgian Bank was a small, closely-held bank in Georgia.

18.     For regulatory reasons, Georgian Bank had to stay under 300 shareholders to remain a nonpublic company.

19.     At a meeting on or about May 13, 2008, Peter Maher, who worked with the Apogee Companies, mentioned the Georgian Bank stock as an investment option for Plaintiffs. Defendant was also at this meeting and agreed this was a good investment option for Plaintiffs.

20.     Andrew Taylor's understanding was that Peter Maher worked for and was supervised by Defendant.

21.     On May 13, 2008, Naomi Taylor sent an email to Maher on which Defendant was copied in which she states: "On the bank investment, I believe that I have $150,000 in a cash account and can use another $50,000 from other cash account (joint with Tip) that he might be using for cash to come up with $200,000 for investing in the bank, if you can give me that much

in shares."[2]  Pl.'s ex. 2 p.68.  She testified at trial she included the last portion of this statement in her email because her impression from Defendant was the Georgian Bank stock was in high demand.

22.    On May 21, 2008, Andrew Taylor emailed Maher and Defendant asking for suggestions about how much stock to purchase, how to fund the purchase, and what loan terms Georgian Bank would offer to loan money against the stock.  Pl.'s ex. 2, p. 71.

23.    On May 21, 2008, Defendant emailed Andrew Taylor:

Tip, the terms are Gordon[3] committed to us after I asked them about it were unsecured (within reason of course, but you two certainly qualify), interest only, prime rate (5%), 50 bps initial fee, and 17 bps for annual renewal fee. Definitely the BEST terms I have ever seen them do, and I have never seen them do anything unsecured . . . but I guess that is part of being in "the club."  We actually don't take very many loans to them as they are hard on their terms, rates, etc . . . but that's likely why they have not been impacted by the subprime issues. I'll forward you their shareholder letters, if you have time to read them you will find them very interesting.

How much??  General rule of thumb is you don't want to see more than 5% of net worth in a single security as a MAXIMUM, so between you guys total we are talking $700k or so.  With that said however, we do know a lot about the bank, so it's not unreasonable to do something north of that number if you really wanted to.  Maybe an even $1 million . . . using the leverage of borrowing a fair amount of the funds might not be a bad idea.  You have to consider what is our downside from here (seems limited to me) and what is our potential upside?  I'd expect this to double if not triple with a strategic buyer.  Me personally, I might bet the farm, but I am guessing between the four of us (Naomi, you, Peter and myself) I probably have the highest risk tolerance of all of us . . . but I have seen some of your small cap stocks Tip, so you might not be as far behind me as I might guess ;-).

Seriously though, this is a very PRIVATE and closed deal, and not that you would, please don't pass it along to anyone.  If you do have a friend/family member or someone that would want to do $200k + just let me know first and we would be happy to talk to them and get them in (especially if local or a potential client of ours or the banks), but it would have to be someone serious and probably able to move quickly.  Pl.'s ex. 2, pp. 70-71 (omissions in original).

---

[2] The parties sometimes refer to Andrew Taylor as "Tip" in their communications.

[3] Gordon Teel was the president and chief executive officer of Georgian Bank at that time.  Def.'s ex. B.

24.    On May 23, 2008, Andrew Taylor emailed Defendant: "I would like to invest $500K but would appreciate your and Peter's advice on the best way to structure it—selling some current securities and using revenue to buy the bank stock, the appropriate split between my retirement funds and regular funds and how much additional debt to take by borrowing from the bank."  Pl.'s ex. 2, p. 70.

25.    Later, Naomi Taylor also indicated she wanted to invest $500,000 in the Georgian Bank stock.

26.    Defendant's plan was to purchase $5 million worth of Georgian Bank stock with $1 million being allocated to Plaintiffs and $1.5 million being allocated to the Apogee Companies.  Another family would then be found to invest in the remaining $2.5 million.

27.    The purchase of the stock had to be closed quickly.

28.    Defendant structured a lending transaction whereby the $5 million needed to purchase the stock would be borrowed from Georgian Bank.  The initial promissory note was dated May 29, 2008.[4]  The loan was renewed on August 29, 2008.  Pl.'s ex. 5. The August 29, 2008 note was in the amount of $5,032.049.00.  *Id.*  The borrower on both the May 29th and August 29th promissory notes was 1842 Capital, LLC.  Defendant signed the August 29th promissory note as managing member of 1842 Capital.  *Id.*  Defendant signed guarantees for both the May 29th and August 29th notes.  *Id.*  Taylor Fairman signed a guarantee for the May 29th note.  *Id.*  Timothy Winder signed a guarantee for the August 29th note.  *Id.*  There are also guarantees for the May 29th note ("May 2008 guarantee"), and August 29th note ("August 2008 guarantee") with the purported signatures of Andrew Taylor and Naomi Taylor for the $5 million loan.  *Id.*

---

[4] The May 29, 2008 note was never offered into evidence.

29.    Apogee GBC 2008 was the purchaser of the Georgian Bank stock.  Defendant testified Apogee GBC 2008 was structured to hold the Georgian Bank stock until it was sold.

30.    On May 22, 2008, Defendant sent Andrew Taylor an email with an information package attached about the Georgian Bank stock purchase.  Def.'s ex. B.  Andrew Taylor recalled receiving the email and printing out the attachment.

31.    The information package contains a two-page summary of the transaction, a Georgian Bank annual report, and some financial highlights and projections.  *Id.*

32.    The two-page summary contains an introductory paragraph, which states:

> It has become necessary for an individual shareholder of Georgian Bankcorporation, Inc. (www.GeorgianBank.com) to sell a large single block of approximately $11.2 million of bank stock at a distressed/block discount rate of $27 per share.  It is our understanding that the reasons for this sale are of a personal nature and totally unrelated to the performance of the bank.  Two Georgian Bank board members have already committed to purchase portions of this block of stock in excess of $2 million each.  Th[r]ough our close connections with Georgian Bank (our offices are located in their Atlanta headquarters building and we do a substantial amount of client business with Georgian Bank so we know their business operations well), we have confidentially and privately been presented the unique opportunity to purchase a substantial portion of the remaining stock through a single purpose entity, Apogee GBC 2008, LLC.  We believe this to be an ideal opportunity for our friends and family and the exact type of small/private deal that we would like to participate in.  *Id.*

The summary also stated that the maximum amount of stock available to Apogee was 265,000 shares ($7.155 million) and the minimum available was 100,000 shares ($2.7 million) to 190,000 shares ($5.13 million), there were currently Apogee client and employee commitments for approximately 100,000 shares or $2.7 million, and the "[e]xpected closing [was] Monday, May 26th, 2008."  *Id.*  In addition, the summary provided that "[b]ank lending can be easily and quickly arranged at very favorable terms for investors.  Terms are unsecured, prime rate (5%), interest only, 0.5% origination fee with an annual 0.17% renewal fee."  *Id.*  Furthermore, the summary indicated that "[m]embership units in Apogee GBC 2008, LLC will be allocated at

7

$27/unit representing an equivalent number of Georgian Bank shares" and that "[m]embers

should expect no dividends over the term of the LLC and this is a highly illiquid asset which

likely [will] be tied up for 3 to 5 years at a minimum." *Id.*

33.    On May 30, 2008, Defendant emailed Plaintiffs about closing the stock purchase

("May 30th email"):

> Just a quick heads up that we are working diligently to close the first part
> of the stock deal today. I may have some documents for you guys to sign . . . if
> possible today . . . or over the weekend if we are all tied up today. You guys
> around???
> We/Apogee 2008, LLC (the single purpose holding entity for the stock) is
> buying the stock today to "close" the deal for the seller . . . and over the next 90
> days reallocating as everybody needs to individual name, IRA's, etc. More to
> follow. Pl.'s ex. 7, p. 118 (omissions in original).

34.    Andrew Taylor testified that the May 30th email was the first time Defendant had

mentioned Apogee GBC 2008. He also testified that he understood Defendant and the Apogee

Companies were going to purchase the stock and then reallocate it to individual investors.

35.    Andrew Taylor responded to Defendant's May 30th email, stating "[w]e are

around all weekend and next week. I leave for Wash June 6 and Naomi and I both leave for

Europe June 9." Def.'s ex. D.

36.    On or about June 8, 2008, Andrew Taylor traveled to the Washington, D.C. area

to give a lecture. On or about June 11, 2008, Plaintiffs traveled to Europe.[5]

37.    On June 11, 2008, Defendant emailed Plaintiffs ("June 11th email"):

> Attached are the organizational documents for Apogee GBC 2008, LLC
> . . . if you need some reading material for the plane. Purchase agreement, copy of
> the stock certificate, etc. Basically I am the "managing member"/President of this
> single purpose LLC, Shannan Collier (one of our attorneys is the Secretary), and
> Taylor Fairman is the CIO (Chief Investment Office). So we should all be pretty

---

[5] In his email responding to Defendant's May 30th email, Andrew Taylor had the dates
wrong for when he was leaving for Washington and when Plaintiffs were leaving for Europe.
Def.'s ex. D.

comfortable that we are in 100% control.  I'll have some additional paperwork for you to sign for your ownership, etc . . . but we can do that when you guys return. We had to go ahead and close the purchase on May 30th (using a loan from the bank in order to close it fast as you know), so we will end up having to "bill" folks a small/proportional share of their interest calculated from 5/30 to the time they deposit their purchase price into the account so we can pay down the loan. We are also asking people to sign (with us) for their portion of the note as a sign of good faith.  However . . . the benefit we negotiated last minute for doing the total block purchase (Apogee did $5,022,000) as fast as we did . . . was some additional WARRANTS which actually brings our purchase price down to $25.70 (or $1.30 off the original $27 purchase price).  Pretty happy about that!!!

In any case . . . Peter passed along the signed wires so we will get that moving ASAP to stop the "clock ticking" on the interest part . . . and we should have the IRA portion done in the next 3 or 4 weeks once Fidelity approves everything.  Please let me know if you have any questions.  Pl.'s ex. 7, pp. 124-25 (omissions in original).

38.    Defendant introduced into evidence a copy of the June 11, 2008 email that showed various attachments which do not appear on the copy of the email Plaintiffs moved into evidence.  *See* Def.'s ex. G; Pl.'s ex. 7, pp. 124-25; Pl.'s ex. 10.  These attachments include documents entitled Apogee GBC 2008, LLC Operating Agreement, Organizational Documents 2008-05-30, Stock-Warrant Purchase 2008-05-30, and Apogee GBC 2008 Stock Certificate. Def's ex. G.

39.    Naomi Taylor testified she believed she received the email with the attachments.

40.    On June 14, 2008, Andrew Taylor responded to Defendant and stated Plaintiffs were lecturing in Vienna, Madrid, and Oporto and that he had not "had [a] chance to read the LLC info but [he] did print it out and brought it on the trip."  Def.'s ex. G; Pl.'s ex. 7, p. 124.

41.    Naomi Taylor testified she understood that Apogee GBC 2008 was a temporary holding entity for depositing funds from all the investors so the loan, which was temporary, could be paid off and each investor could receive their own shares of Georgian Bank stock.  She testified this understanding was based on Defendants' May 30th email.  She believed she and her

husband were buying Georgian Bank stock and there would be Georgian Bank stock certificates in their names.

42.    Andrew Taylor testified his understanding was that Plaintiffs were purchasing Georgian Bank stock, and the money they gave Defendant would be used to pay for the stock.

43.    Defendant introduced into evidence a wire transfer authorization for $150,000; a wire transfer authorization for $200,000; a check for $60,000; and a check for $40,000. Def.'s ex. J.  The wire transfer authorizations direct that the funds be transferred to Apogee GBC 2008 from Fidelity accounts, and the checks are written to Apogee GBC 2008. *Id.*  The wire transfer authorizations have a June 7, 2008 date printed at the top.  *Id.*  The two wire transfer authorizations also have fax transmittal sheets attached with transmittal dates of June 13, 2008, and June 23, 2008, respectively.  *Id.*  The checks are dated October 13, 2008.  *Id.*  These checks and wire transfer authorizations have Naomi Taylor's purported signature on them.  *Id.*

44.    Defendant also introduced into evidence a document captioned "APOGEE GBC 2008, LLC ACKNOWLEDGMENT OF AND BY NEW MEMBER," a document captioned "APOGEE GBC 2008, LLC NON-DISCLOSURE AGREEMENT," and a request for alternative investment transaction that lists Apogee GBC 2008 next to "Product Description."  *Id.*  Both the acknowledgment of and by new member and request for alternative investment transaction have numerous blanks on them that are incomplete.  *Id.*  These documents have Naomi Taylor's purported signature on them.  *Id.*

45.    Defendant testified the fax transmittal cover sheets with transmittal dates of June 13, 2008 and June 23, 2008 represent the dates the Apogee Companies sent the wire transfer authorizations to Fidelity to have the funds transferred from Fidelity to Apogee GBC 2008.

46.     With respect to Andrew Taylor, Defendant introduced into evidence a wire transfer authorization for $150,000.  Def.'s ex. I, p. 129.  The wire transfer authorization directs that the funds be transferred to Apogee GBC 2008 from a Fidelity account, has a June 7, 2008 date printed at the top, and has Andrew Taylor's purported signature on it.  *Id.*  There is also a fax transmittal cover sheet attached with a transmittal date of June 23, 2008.[6]  *Id.* at pp. 130-31. In addition, Defendant introduced a request for alternative investment transaction for Andrew Taylor's IRA, which authorizes National Financial Services LLC (NFS), agent for Fidelity Management Trust Company, as custodian for Andrew Taylor's account to purchase $350,000 worth of shares/units in Apogee GBC 2008.  *Id.* at 133.  It is dated September 29, 2008, and has Andrew Taylor's purported signature on it.  *Id.*

47.     Defendant introduced into evidence membership unit certificates in Apogee GBC 2008 listing Plaintiffs as owners of the units.  Def.'s ex. H.  Plaintiffs testified they had not seen these certificates.  Andrew Taylor testified he would have expected Defendant to hold stock certificates for him and would not have expected to see the certificates.

48.     Andrew Taylor testified he along with Defendant and Peter Maher decided where to obtain the funds to pay for the Georgian Bank investment.  Andrew Taylor authorized the funds for the stock to be taken from various accounts, and Defendant and Maher had discretion about when to transfer the funds.

---

[6] The Court sustained the objection of Plaintiffs' counsel to pages 130-31 of Defendant's exhibit I being admitted into evidence.  However, Defendant testified the fax transmittal cover sheet with a transmittal date of June 23, 2008 would have represented the date the Apogee Companies sent the wire transfer authorization to Fidelity to have the funds transferred from Fidelity to Apogee GBC 2008.  Furthermore, the reconciliation Defendant prepared of funds received by Apogee GBC 2008 and the reconciliation he prepared of Apogee GBC 2008's Wachovia bank account show a $150,000 wire from Andrew Taylor's Fidelity account on June 23, 2008.  Pl.'s ex. 13, pp. 8, 10.

**C. The Calling of the Loan and Start of Litigation**

49.     On July 10, 2009, Plaintiffs each received notices regarding approximately

$14,000 in interest due on a loan from Georgian Bank.  According to her testimony, Naomi

Taylor sent an email to Defendant inquiring about the matter because she did not believe they

had a loan with Georgian Bank.  Defendant responded that Plaintiffs should not have gotten the

notice, that he would take care of it, and that they should not worry.  The specific emails were

not introduced into evidence.

50.     Defendant testified the mistake in Plaintiffs' receiving the past due notice on the

Georgian Bank loan was that Apogee GBC 2008 had not made the payment on the loan when it

was due, not that Plaintiffs received notice about the missed payment.

51.     On August 17, 2009, Andrew Taylor emailed a list of items Plaintiffs wanted to

discuss with Defendant and Maher at their next meeting.  One of the items on the list is "[u]pdate

on Georgian Bank: 2nd Quarter report.  We would also like to be reminded of reason for the past

due notices sent to me and Naomi for $14,000 each."  Def.'s ex. K, pp. 171-72; *see also* Def.'s

ex. L.

52.     Because Plaintiffs each received a past due notice from Georgian Bank regarding

a $5 million loan, they believed their exposure was $10 million.

53.     On August 20, 2009, Defendant met with Plaintiffs.  Naomi Taylor testified that

at this meeting, Defendant informed Plaintiffs the notices were regarding a loan related to the

Georgian Bank stock purchase.  He also informed Plaintiffs they had signed guarantees on a $5

million loan.   Plaintiffs were unaware before this meeting that they had purportedly signed

guarantees.

54.     There still appeared to be some confusion regarding the Plaintiffs' risk related to

the loan, as after the meeting, Andrew Taylor sent an email dated August 20, 2009, to Defendant:

> Since leaving your office I haven't been able to think of anything but the Georgian Bank.  It would be very painful but we can survive losing a million dollars; bankruptcy would be devastating.  Naomi and I were reviewing the past due notices from Georgian Bank.  They state that we are each Guarantors of loans of $5,032,049 or total loans exceeding 10 million dollars for both of us.  We thought our risk was limited to our $950,000 investment and did not knowingly borrow any money or sign any loan agreement.  What is the total debt and how did the bank determine that we owed 10 million dollars?
>
> I assume we had copies of the forms we signed but I can't find them.  Can you send us copies of those forms and copies of the loan agreement with the bank so that we can get a better understanding of our risk?  Pl.'s ex. 15.

55.     Defendant responded to Andrew Taylor with Naomi Taylor and Peter Maher

copied on the email:

> Tip, my apologies as I may have overstated the matter from a "technical" perspective.  The TOTAL loan is only $5 million remaining.  NOT per person as you have inferred below.  So, in the doomsday scenario the[y] "could" go after ONE person for the entire amount and once the $5 million is paid, no one else is liable.  NOT go after everybody "each" for $5 million.  Some people are smaller, and some people liable are in excess of $30 million/liquid – net worth.  It is a small risk to you and Naomi, I truly [sic] feel very small, so I might have overstated the true risk.
>
> I'm on my way to meet Dave's friend so [I]'ll write more later . . . but not remotely near what you are thinking.  Sorry to have overstated.  We have seen so much craziness [sic] this past year that the 1 in a million still worries me . . . But as I said you have my 1,000% commitment you guys won't be impacted be it the $950k or anything else.  As I said . . . no more "family" deals :-).  Pl.'s ex. 15 (omissions in original).

56.     Defendant sent a second response to only Andrew Taylor:

> Tip, P.S. And I wanted to write just you back since I don't want you to worry, but I am serious about the fact that I'll make sure you two are not impacted on the investment.  You have my personal commitment to that forever.  All indications are thin[g]s will work out and we will get our investment back "eventually" . . . or at least a good part of it.  I know as you said you were looking for a good deal to make a good return . . . but regardless it is something I got you two into (the investment piece) and I don't want to see you lose anything based on your faith/trust in me.  Our word is all we have at the end of the day, so that is important to me.  The bank has already agreed to split up the loan/and take people

off . . . I wish I had just got that done before today.  I have been more worried about the investment hit than anything for you two, but it is something we can overcome, but I can carry that piece and am reconciled to such if the ultimate "remote" occurs.

People think I am crazy for committing such, I just think it is the right thing to do.

Make sense?  Def.'s ex. M, p. 183 (omissions in original).

57.    Andrew Taylor replied:

We are very relieved to hear that the total debt is only $5 million.  Naomi and I looked carefully at the bills from the Georgian Bank when we got home. We each got a separate bill from the bank for the interest on a 5 million dollar loan so we assumed that a much larger loan package had been subdivided and our proportion (however that was calculated) was 5 million each.  Apparently, the Bank was billing each of us separately for the full amount of the loan, not very thoughtful management.

You did recommend the bank stock but we also thought it would be a very good investment; we could have said "no thanks."  I wanted Peter to be more aggressive with stock purchases after our previous meeting than he was probably inclined to be; the stock market could have gone down instead of up. Unfortunately, the opportunity to invest in Georgian Bank came just after I had the $950,000 settlement with Reinke and it presented the opportunity to get rich quick and pay off that debt so I invested much more in Georgian Bank than I probably would have under different circumstances.[7]  You aren't responsible for my desire to get rich quick.

Anyway, we will proceed with our plans to refinance our house.

Thanks for the followup; we do feel better.  Def.'s ex. M, p. 183.

58.    Naomi Taylor testified she was not aware of anyone obligated on the loan who was worth $30 million or worth anything the lender could collect against and that as it turned out, Plaintiffs were the "low-hanging fruit."

59.    Naomi Taylor testified she would not have invested money in the Georgian Bank stock if she knew Defendant had no other clients buying the stock.

---

[7] The settlement Andrew Taylor references in this email related to litigation involving the dissolution of a real estate partnership and is unrelated to this adversary proceeding for the most part.  Based on this email, the outcome of that litigation was a factor in Andrew Taylor's decision to participate in the Georgian Bank investment.  In addition, Defendant argued that Andrew Taylor's participation in a business entity whose sole purpose was to hold real estate suggested that Andrew Taylor understood the logic behind having Apogee GBC 2008 own the Georgian Bank stock.

60.    Defendant testified that aside from about $1,000 he put into the transaction, Plaintiffs were the only people who put money into the transaction.

61.    Defendant testified that Taylor Fairman did not have assets to pay a $5 million loan and that Fairman acquired no ownership interest in Apogee GBC 2008.

62.    The person purportedly worth $30 million referenced in Defendant's initial response to Andrew Taylor with Naomi Taylor and Peter Maher copied was most likely Timothy Winder.  Winder was not worth $30 million.

63.    On September 10, 2009, Andrew Taylor emailed Defendant:

> We just got another bill from Georgian Bank which lists us as guarantors of a 5 million dollar loan.  It would be very painful but we could survive the $950,000 loss of our investment but we would be bankrupt if we were responsible for a 5 million dollar loan.  I don't seem to have a record of what we actually signed when we thought we were just purchasing $950,000 worth of Georgian Bank shares.  We would like to have a record of that purchase.  Also, at our last meeting, you mentioned that you would restructure the loan in Sept so that we would no longer be guarantors of the loan.  We check the news every weekend to see if Georgian Bank is one of the banks that has been shut down and we will sleep more comfortably when we have documentation that we are off that loan.  Thanks. Def.'s ex. M, p. 189.

64.    Defendant never responded with the documentation Andrew Taylor requested in the August 20, 2009 email and the September 10, 2009 email.

65.    Defendant responded to Andrew Taylor's September 10th email:

> Hi Tip . . . we got one at the office today as well . . . I think they just send them to everyone.  I am working through the renewal with the bank now and they are entertaining allowing us (Apogee and ATS Fidelis) to substitute as guarantor on the loan, so that's good news.  We are still early stage with those two companies in their growth and income . . . but as un-enjoyable as it would be they can carry and pay off the loan in full (over time of course) and it will become easier and easier as their respective success grows . . . so as much as we keep our fingers crossed for the bank and will do all we can to help them . . . we are fortunate to have diversified income and capital sources to weather the worse case scenario—for all of us as I have committed to you guys for recommending the investment.  As for the loan itself we are all paid up and current and as discussed when we meet [sic] it would probably be the end of September before we had the

15

whole thing refinanced.    I'm providing the bank financials, etc. on the replacement guarantors (Apogee & Fidelis) so it will be a couple of weeks until that is done and they can give us a decision.
        . . . .
        I'll keep you updated and as always if you have any questions please ask. We are carrying the worry and I am sorry you guys are having to worry as well (as it's counter to what our job is as we are supposed to keep you out [of] things you would have to worry about) . . . but as always we will weather this and all that I/we have will stand behind making sure you two are unscathed.  Def.'s ex. M, p. 189 (first, second, third, fourth, fifth, and seventh omissions in original).

66.    Andrew Taylor replied:

        Thanks for getting back to us.  We all thought the investment was good at the time.  Probably $100,000 would have been a more reasonable investment for me but I was greedy and wanted to quickly make enough money to pay off the $750,000 debt that my lawsuit generated.[8]  Even if the bank fails and I lose the $500,000, we consider it an investment in your current and future companies and you can wait until you have your first 20 million before you worry about replacing it.
        On the other hand, we really want to be off the loan.  I know you said that Apogee and ATS Fidelis can repay the $5,000,000 but what if the purchaser of a failed Georgian Bank wanted all its money now.  Naomi and I have assets that can be liquidated.  I don't know what Apogee and ATS Fidelis have and I'm not sure the purchaser would care where the money came from.  In my lawsuit, Reinke wanted his $950,000; he didn't care where I got it.  I hope the refinance can be resolved before I leave for Nepal Oct 3.  Def.'s ex. M, p. 188.

67.    Defendant emailed Plaintiffs again on September 23, 2009:

        Don't mean to alarm you, but wanted you to know that a FedEx package from the lawyers at the bank will be at your home address tonight.  It was something they sent out to everyone, so we all got it.  I have met with the two bankers this afternoon that were cc'd on the letter and I had a rather direct conversation with them as to the options.  Although they are willing to work with me on the renewal they have their "process" and this is just part of protecting their Interests.  These are different bankers than we were dealing with 6 months ago and before . . . so they don't fully understand the totality of our relationship with the bank and frankly given the change of control with Gordon leaving and their fear that Georgian will be taken over . . . I am not sure they are in a position to do much from a relationship perspective.
        There are two issues here:

---

[8] This is another reference to the litigation in which Andrew Taylor was involved related to the dissolution of a real estate partnership.

1. Value of Stock.  Due to the frankness of the bank employees I meet [sic] with today . . . the prospects I have for the stock itself and the new management working the bank out of this problem are darkened. As we all have discussed I know we were all hoping for an easy return on our investment, but this is still something I recommended and as promised will do all I can to make that up to you.  It is not good for us all . . . but we will do what we have to do to overcome it.

2. Loan.  My #1 concern is to get you two off the loan guarantee with the renewal (at Georgian or wherever else we move it as discussed below.)  The other guarantors are understanding of why we will release you two and have no objections and totally agree with that approach . . . so that is good news.  I just have to get the bank to do so as well.

<u>Current course of action to release the Taylor's</u>: My efforts have been in working with Georgian Bank in an endeavor to help preserve their business and the equity we all have in Georgian.  This week alone we placed a new $1 million estate cash account with the bank and will place $4 million more in the next 5 to 10 days as the insurance proceeds are paid (all FDIC insured of course).  If the employees don't care and the equity will be whipped [sic] out . . . then there is no real reason to limit our loan options and relationships to just Georgian.

As such I have scheduled with hast [sic] meeting with 3 local banks/bankers we know that given the circumstances could do this for us. Atlantic Capital, Bank of North Georgia, and Ironstone Bank.  Atlantic Capital is another privately held bank (new bank that started right at the beginning of this mess and has NO bad loans whatsoever) and a bunch of former Synovus executives that know Apogee and know the family office/investment business extremely well.  I suspect they are our best option and can make a decision FAST as I would like this behind us.  We meet [sic] with them 3 weeks ago on regular business matters . . . and I have a client (I gave him the whole scoop of what I was dealing with—also a long term associate and shareholder at Atlantic Capital) calling the Chairman of the bank at this moment to schedule a meeting with him ASAP.  The client though[t] they would be VERY interested in talking and said I might as well start at the top.

I also have a call in to Mr. Teel as well for his advise [sic] and recommendation as to where we can move the loan.  He knows our business, the relationships we bring and has a lot of friends in the industry . . . so that will add more people to the list to talk with.

As [ ] another option . . . one of our clients is the national investment banker for our industry out of NYC.  She knows players on a national level that would be available to take this on for us.

We are all working on this and I apologize this has infringed upon the two of you.

<u>I "know" with every fiber of my being that we will get this taken care of and release you two from the loan . . . and although I am perhaps overreacting to this and overly concerned because you two are like family and I am just dumbfounded I did not foresee such a insane scenario of events . . . but regardless this is something that I will get taken care of as a concern for the two of you.</u>

> Call me and I am happy to talk or come meet you tonight or any time that is convenient.  Pl.'s ex. 16 (omissions in original).

68.     At some point between July and September of 2009, Plaintiffs each received a $5 million demand letter from Georgian Bank on the loan.

69.     In October 2009, Plaintiffs had retained Louis Cohan as their legal counsel and were investigating Defendant and considering legal action.   On October 1, 2009, Defendant emailed Plaintiffs and David Pemberton:

> David, thank you for this email.   The fact that you addressed it to "Family" is why this situation destroys me inside.  As we have discussed many times, family is the people you surround yourself with and the people you admire, care about and would do anything in the world for.  You are my "family" because in good part due to this family-less bound [sic] we both share, Adina is as well because of the dedication I see between the two of you and she is more of a sister to me than I could ever imagine, and your children are like my own.  Tip and Naomi are by association introduced the same to me . . . but as people, parents and professionals they are "soles" that I admire and although I've never been comfortable/comfortable around as family as I am with you and Adina, they are people that are closer to me than any family I know.   They are your "real" family/parent . . . but they are both my parents by proxy.  Pl's ex. 18 (omissions in original).

Defendant also states in the email that the only way he can rectify the situation is through continuing to develop his business interests but that "if Louis [Cohan] does what Louis wants to do, it is hopeless and [he] might as well not go to work tomorrow and let the chips fall where they may."  *Id.*  He further writes that "if [Cohan] had one bit of counsel as to what [he] should do to take all this on [him]self to protect the Taylors and how [he] could sign away and personally indemnify the Taylors for the rest of [his] life . . . that would be fine."  *Id.* (omission in original).  Finally, he states that he "had successful meetings with two banks so far, and [he has] more scheduled . . . but no one is going to want to talk to us if Louis is out filing lawsuits."  *Id.* (omission in original).

18

70.     On October 2, 2009, Defendant sent another email to Plaintiffs expressing concerns about Cohan's investigation and describing Defendant's efforts and plans to resolve the situation with the loan.  Pl.'s ex. 19.

71.     In September 2009, Georgian Bank was closed by the Georgia Department of Banking and Finance, and the Federal Deposit Insurance Corporation ("FDIC-R") was appointed as its receiver.  FDIC-R entered into an agreement with First Citizens Bank and Trust Company ("First Citizens") under which First Citizens acquired certain assets and liabilities of Georgian Bank, including the notes and guarantees at issue in this case.

72.     On October 15, 2009, First Citizens filed an action in state court in Fulton County, Georgia against Davis, Andrew Taylor, Naomi Taylor, 1842 Capital, Timothy Winder, and Taylor Fairman seeking the amounts owed under the notes and guarantees at issue.  On August 20, 2010, after First Citizens re-conveyed the notes and guarantees at issue to FDIC-R and FDIC-R was substituted as the plaintiff, FDIC-R removed the case to the United States District Court for Northern District of Georgia (the "FDIC-R action").

73.     On November 28, 2011, Plaintiffs were dismissed without prejudice from the FDIC-R action.

74.     While Plaintiffs have not been found liable in the FDIC-R action, Andrew Taylor testified Plaintiffs paid legal fees and "enormous heartache" in defending the FDIC-R action for over two years.

75.     On October 19, 2009, Plaintiffs filed suit against Defendant and others in Fulton County, Georgia ("Fulton County action").  Plaintiffs assert the filing of the Fulton County action occurred before they were served in the FDIC-R action.

76.     Defendant sent an email to Plaintiffs on October 29, 2009.  The subject of the

email was "THE LATEST FROM LOUIS—STOP IT OR I QUIT:"

I AM DONE unless this does not stop with Louis.  I and everybody else in
the world (related to me or not) received the attached and I just saw this myself 15
minutes ago.  I have stepped up to take the total hit on this situation; I have
focused solely on doing what will protect you but every 2 minutes I am attacked
by Louis.  Everything he does jeopardizes ANY ability for me to #1 get a loan to
settle with the bank and #2 get the bank to settle.  ALL I seem to be doing is
dealing with Louis and his bull[] . . . so either he STOPS or I STOP.

We are making great progress #1 dealing with the issue with the bank, as
well as #2 finding a lender to loan me the money . . . the ONLY 2 important
things in this world . . . but Louis has distracted EVERYONE on my team and
every business partner I have that is helping me (and thus YOU) out of this mess.
My friends care about you because they know I care about you . . . but I am not
asking them to keep helping me if you do not have Louis STOP immediately.
You can love him and trust him all you want . . . well let him help YOU when I
quit because I have nothing of value if you keep suing me.  Then YOU will be the
only people the bank will have to go after.  You win . . . but YOU LOSE!!!

Here is my requirement as you have left me with NO options:
1.      Withdraw the lawsuit without prejudice and re-file if this matter is
        not cleared up by January 1, OR
2.      I quit and you are on your own.

I don't care anymore and can live with either route you want to take . . .
but I cannot do what MUST be done with Louis destroying every ability I have to
raise money and distracting everyone helping me with this matter.

Let me know by 5pm tomorrow as I QUIT otherwise.  Pl.'s ex. 20
(omissions in original).

77.     The following day Defendant sent a further email to Plaintiffs, stating in

part:

5.      WORST OF ALL . . . Luis [sic] has requested all bank info for
which I have signatory authority.  This drags in every client/association I have that
has nothing to do with this.  I will not let this happen because I am working on the
bank situation, so I will turn 100% of my attention to fighting Louis.  It is insane
what he is asking for and the unrelated people and business entities he is dragging
into this without cause.  Get ready, these people are going to go after/sue YOU for
this overreaching invasion of privacy and I will help them do that full time!!!

6.      I am in discussions daily with the Chairman and/or CEO/President
of TWO privately held local banks to get the money to SETTLE this issue with
the bank.  I am NOT going to continue this course with Louis doing what he is
doing.  I will QUIT and focus 100% on Louis and defending my friends and

clients that have NOTHING to do with this first . . . so pick what you want me to do.

       7.     ALSO, I am meeting and in discussions daily with a friend and merging his practice/business into Apogee. It is me selling part of my business to pay this settlement with the bank. It would add $4 million plus of revenue and $600 million + client investment assets. This could SOLVE the bank issue with collateral and cash . . . but I am NOT going to continue this with Louis doing what he is doing to DESTROY Apogee. I won't risk my friend merging his business into Apogee as the firm is dragged through the mud. I will tell EVERYONE to go work for him and Apogee will be worth ZERO . . . thus I have zero and you get zero help and have to deal with the bank by yourself!!!

    . . . .

       I care about my family, friends and clients . . . and CARED about you two and wanted to help protect you to whatever detriment this may have on me personally . . . but with these attacks I have NO options and now have NO guilt anymore and unless Louis stops you are on your own. You are bringing it on yourselves at this point, so good luck. I have A LOT of people that care about me because they know who I am inside and know that I would do the same for them . . . but I am not going to have them suffer because of Louis and because you two have brought into his claim that I am a CROOK. You know me and if you are the type of people that can let some b.s. attorney convenience [sic] you I am something I am not . . . . Then good luck to you. Is Louis willing to sacrifice himself and pay off the note/settlement in full to protect you??? I am the only IDIOT standing up trying to fix this . . . to help you and others . . . while you have let an attorney convenience [sic] you I am a CROOK and sue me and every friend/business partner I have. Well, I have been more than open with you two, David, anyone in what happened – good bad and ugly . . . and have tried to do the stand up thing and get us all out of this at my personal detriment . . . but you know what, we are all adults and if you are all about attacking me and protecting yourself . . . I will be too!!! I am NOT going to try to keep helping someone suing me . . . so make your decision fast, because I QUIT otherwise. Pl.'s ex. 21, pp. 2-3 (all omissions except for the fifth are in original).

78.    On November 20, 2009, Plaintiffs voluntarily dismissed the Fulton County action without prejudice. Naomi Taylor testified Plaintiffs dismissed the Fulton County action because she felt overwhelmed and because Pemberton and Defendant wanted the lawsuit out of the equation so the situation perhaps could be resolved through other means.

79.    After the situation was not resolved through other means, Plaintiffs filed what they have described as a renewal of the Fulton County action in Cobb County, Georgia in April 2010 ("Cobb County action"). *See* Ga. Code Ann. § 9-2-61(a).

80.     Subsequently, Defendant moved to South Carolina and filed bankruptcy under chapter 7.  Defendant's bankruptcy filing stayed the Cobb County action.

81.     When Plaintiffs began alleging Defendant forged documents, Defendant testified he essentially quit working and closed his businesses.  He testified all of his assets were illiquid businesses, and he "shut everything down, and [he] was done."

82.     Defendant has filed a lawsuit against Plaintiffs in the United States District Court for the District of South Carolina.  Defendant served Plaintiffs with that lawsuit while they were in the courtroom waiting for the trial in this case to start.

83.     Defendant asked Naomi Taylor whether she was aware that the Cobb County action, Defendant's bankruptcy, and his lawsuit against Plaintiffs would be over if Plaintiffs had not objected to his discharge.

84.     Defendant also introduced a question by stating everything could have been over when Plaintiffs were dismissed from the FDIC-R action and asked Naomi Taylor why she did not retire then.  Naomi Taylor responded Defendant would have stolen $950,000 from Plaintiffs, that is not right, and they could not just dismiss that.

85.     Naomi Taylor testified that if Plaintiffs had known everything they should have known about the Georgian Bank stock purchase, including that she and her husband were the only people actually providing money for the stock and that their names were on a $5 million guarantee, they would not have made the investment.

86.     Defendant asked Andrew Taylor whether his decision to invest in the Georgian Bank stock would have changed if he had full information about the transaction.  Andrew Taylor responded: "It would have helped enormously if you had said Tip and Naomi you are not buying one single share of Georgian Bank stock, let me repeat it, not one single share of Georgian Bank

stock.  I am going to put your money in a shell company, and I am going to take that money out of that shell company for my own expenses."  If Defendant had said that, Andrew Taylor indicated he would not have participated in the investment.

**D. The Alleged Forgeries**

87.    Plaintiffs deny signing guarantees for the $5 million loan and assert their signatures were forged on the guarantees dated May 2008 and August 2008.

88.    Defendant appeared on behalf of Plaintiffs when obtaining the loan from Georgian Bank and provided Plaintiffs' financial information to obtain the loan.

89.    Defendant testified the loan to purchase the Georgian Bank stock was his idea and he was the only person who approached Georgian Bank about the loan.

90.    Defendant testified that aside from about $1,000 he put into the transaction, Plaintiffs were the only people who actually put money into the transaction.

91.    Plaintiffs did not meet with or talk with Georgian Bank in connection with obtaining the loan.

92.    Andrew Taylor testified he was in Europe in the Alps with his daughter and a friend on August 29, 2008.

93.    Andrew Taylor testified Naomi Taylor was not in Atlanta, Georgia on August 29, 2008, but was in southern Georgia with her daughter.

94.    Naomi Taylor denies ever agreeing to borrow money to purchase the Georgian Bank stock.

95.    Andrew Taylor testified there were discussions about borrowing money to invest in the Georgian Bank stock, but he never actually agreed to be part of a loan to purchase the stock.  When he later found out through the June 11th email that a loan was involved, Andrew

Taylor testified he did not question Defendant's taking out the loan because he trusted Defendant's decision that using a loan was the best way to complete the transaction.

96.     In the June 11th email, Defendant stated:

> We had to go ahead and close the purchase on May 30th (using a loan from the bank in order to close it fast as you know), so we will end up having to "bill" folks a small/proportional share of their interest calculated from 5/30 to the time they deposit their purchase price into the account so we can pay down the loan. We are also asking people to sign (with us) for their portion of the note as a sign of good faith.  Pl.'s ex. 7, pp. 124-25.

He also wrote that "[i]n any case . . . Peter passed along the signed wires so we will get that moving ASAP to stop the 'clock ticking' on the interest part . . . and we should have the IRA portion done in the next 3 or 4 weeks once Fidelity approves everything."  *Id.* (omissions in original).

97.     Defendant testified there was never any discussion about people involved in the investment and loan only being liable on the loan for their portion of the Georgian Bank stock purchase, i.e. Plaintiffs would be liable for $1 million until they paid for their $1 million investment.

98.     Defendant asked Andrew Taylor whether a handwriting expert had reviewed the purported signatures of Plaintiffs on the May 2008 and August 2008 guarantees.  Andrew Taylor responded that a handwriting expert, Mr. Carney, reviewed their signatures.  When Defendant asked about Carney's opinion, Andrew Taylor testified that Carney's opinion was what appear to be Andrew Taylor's signatures on both the May 2008 and August 2008 guarantees were simulations.  When Defendant asked about Carney's opinion with respect to Naomi Taylor's

purported signatures, Andrew Taylor testified Carney's opinion, with the highest confidence, was what appear to be her signatures on both guarantees were forgeries.[9]

99.    In responding to First Citizens' First Requests for Admission in the FDIC-R action, Andrew Taylor indicated he executed the May 2008 and August 2008 guarantees.  Def.'s ex. Q.  In an affidavit in support of a request to withdraw this admission, Andrew Taylor stated:

> At the time I made the admissions set forth above, I was operating under the mistaken assumption that I had executed the Commercial Guaranties, based on the myriad of other documents I had signed at the behest of Defendant R. Jefferson Davis, Jr. . . . and representations from Davis himself in which he indicated that I had executed same (this assumption was reinforced by a demand letter I received from Georgian Bank also asserting that I had executed the Commercial Guaranties).  At the time, I trusted Davis (he was my son-in-law's best friend and had been my financial adviser for the past several years), but no copies of documents I had purportedly signed related to the purchase of Georgian Bank stock had been provided to me.
> This mistaken assumption was also the basis for representations in my Answer and Defenses, responses to First Interrogatories and a complaint filed on my behalf in a separate related matter in which indicated that I executed the Commercial Guaranties.
> . . . .
> I did not examine the signatures on the Commercial Guaranties prior to admitting their genuineness.  I trusted Davis, had no reason to suspect a potential forgery and never doubted Davis' affirmations that I had executed the Commercial Guaranties. . . .
> Several months into this litigation, I began to request and review various documents in order to produce them in response to discovery requests.  The detailed information I began to discover during the course of this litigation led me

---

[9] Prior to trial, Plaintiffs indicated they would offer Carney's testimony via deposition. Defendant filed a motion to exclude Carney from testifying at trial, a motion for a protective order regarding Plaintiffs' notice of deposition of Brian Carney, a motion to reconsider the Court's Order denying his request for a protective order, and a motion to exclude Carney's testimony based on the absence of local counsel for Plaintiffs at Carney's deposition. The Court denied the motion for a protective order before trial. These other motions are now deemed moot because Plaintiffs did not offer Carney as a witness at trial or ask that his deposition be admitted into evidence. Given Defendant's vigorous opposition to Carney being allowed to testify at trial and Plaintiffs' decision not to offer his testimony, the Court will not surmise why Defendant asked Andrew Taylor about Carney's opinions, thus making part of record before the Court the fact that Plaintiffs have a purported expert who has opined Andrew Taylor's signatures on the guarantees are simulations and Naomi Taylor's signatures are forgeries.

to question the basic assumptions I had previously held regarding the underlying transactions.

Specifically, a few weeks after serving my responses to the Requests for Admission, our attorney, Louis Cohan, called from the bank where he was inspecting the original loan file.  Mr. Cohan asked if we knew there were guaranties in both May and August of 2008.  My Wife and I had never heard that before, and we were certain we did not sign two sets of guaranties.  At the time of my faulty admissions, I was unaware there were two guaranties allegedly executed on two separate dates.  I thought the use of the plural "guaranties" referred to the guaranty allegedly signed by me and the guaranty allegedly signed by my Wife in May of 2008.

Mr. Cohan asked if I signed any guaranty with a felt tip pen as it appeared one of the guaranties had been signed with same.  I was sure I had not signed any guaranty with a felt-tip pen.  Mr. Cohan sent us copies of the Commercial Guaranties, told us where to locate the dates and instructed us to carefully review them.

Upon further inspection of the Commercial Guaranties, I noticed my purported signature on the May guaranty didn't even match my purported signature on the August guaranty.  Based on discovery of a second set of guaranties, the fact that I was out of the country when the second guaranty was purportedly signed, and my careful review of the signatures, I then knew for certain that I had not signed the Commercial Guaranties.

I did not execute the Commercial Guaranties.  My previous responses in which I admitted executing the Commercial Guaranties, or previous submissions to this Court in which I indicated I executed the Commercial Guaranties, were erroneous and based purely on my mistaken assumption (fostered by the consistent and unequivocal affirmations of Davis) that the Commercial Guaranties were included in the various documents I signed at Davis' request related to the purchase of the Georgian Bank stock (an assumption that was reinforced by the demand letter from Georgian Bank indicating that I had executed the Commercial Guaranties).  *Id.*

100.   The May 2008 and August 2008 guarantees Andrew Taylor purportedly signed were included with a demand letter Georgian Bank sent prior to the filing of the FDIC-R action.

101.   Andrew Taylor testified it never occurred to him until later that Plaintiffs' signatures were forged on the guarantees.

102.   The court in the FDIC-R action permitted Andrew Taylor to withdraw his admission.  Although discussed at length by Plaintiffs' counsel and Defendant at trial, the order allowing Andrew Taylor to withdraw his admission was not offered into evidence.  The Court

references the order here to clarify there is not an admission at this time in another lawsuit that Plaintiffs executed the guarantees.[10]

103.    Andrew Taylor testified he did not sign any documents between May 30, 2008, and June 11, 2008, other than perhaps wire transfer authorizations.

104.    Defendant asked Andrew Taylor whether it was possible he forged Naomi Taylor's signature.  Andrew Taylor responded "absolutely not."

105.    During his testimony at trial, Defendant also theorized that Andrew Taylor signed Naomi Taylor's name on the May 2008 guarantee.

106.    Defendant testified the signatures on the guarantees are nowhere near Naomi Taylor's actual signature.

107.    During a deposition in the FDIC-R action, Plaintiffs' attorney asked Defendant whether he signed Plaintiffs' names on the May 2008 and August 2008 loan guarantees without their authorization, whether he took the May 2008 loan guarantees to Georgian Bank to induce it to lend $5 million, and whether he took the August 2008 loan guarantees to induce Georgian Bank to renew the $5 million loan.  Defendant asserted the Fifth Amendment in response to each of these questions.  When asked at the deposition whether he was asserting the Fifth Amendment to avoid incriminating himself, Defendant asserted the Fifth Amendment in response.[11]

108.    Defendant asserted the Fifth Amendment in response to these questions based on the advice of counsel.

---

[10] Naomi Taylor also admitted to executing the guarantees in the FDIC-R action and was allowed to withdraw her admission.  Defendant did not question her about her request to withdraw her admission or introduce her affidavit in support of her request into evidence.
[11] The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."

109.    In the May 30th email, Defendant wrote: "Just a quick heads up that we are working diligently to close the first part of the stock deal today.  I may have some documents for you guys to sign . . . if possible today . . . or over the weekend if we are all tied up today.  You guys around???"  Pl.'s ex. 7, p. 118 (omissions in original).

110.    Defendant testified the documents to which he alluded in the May 30th email were the guaranties and because the loan closed on May 29th, the guarantees needed to be provided to the bank on May 30th, if possible, but no later than the following Monday, which was June 2, 2008.

111.    Defendant testified he had some emails indicating the guarantees were taken to Georgian Bank on Monday, June 2, 2008.  These emails were not introduced into evidence.

112.    Defendant testified that someone between May 29, 2008 and June 2, 2008 physically brought the May 2008 guarantees to Plaintiffs for their signatures, but he did not know who or when.  He testified that he or Peter Maher could have been the person who brought the guarantees to Plaintiffs and that, aside from fax or email, this was the customary manner in which documents were provided to Plaintiffs.  He knew the guarantees were brought to Plaintiffs between these dates because the guarantees had to be given to Georgian Bank on June 2, 2008. He speculated the guarantees were taken to Plaintiffs at the same time as the wire transfer authorization forms contained in Defendant's exhibits I and J because there is no evidence the wire transfer authorizations were emailed or faxed to Plaintiffs.

113.    Defendant testified he does not know who signed the guarantees that have Plaintiffs' purported signatures on them.

114.    Defendant testified he does not know how the August 2008 guarantees were provided to Plaintiffs for their purported signatures or when the guarantees were signed.

**E. The $950,000**

115.    Plaintiffs paid $950,000.00 to Apogee GBC 2008 for their portion of the Georgian

Bank stock investment.  These funds were transferred to Apogee GBC 2008 through a $150,000

wire transfer from Naomi Taylor's Fidelity account on June 13, 2008; a $200,000 wire transfer

from Naomi Taylor's Fidelity account on June 23, 2008; a $150,000 wire transfer from Andrew

Taylor's Fidelity account on June 23, 2008; a $350,000 wire transfer from Andrew Taylor's

Fidelity account on October 7, 2008; a $60,000 check from Naomi Taylor dated October 13,

2008; and a $40,000 check from Naomi Taylor dated October 13, 2008.  *See* Pl.'s ex. 13, pp. 8,

10; Def.'s exs. I, J.

116.    Defendant states in his June 11th email that "we will end up having to 'bill' folks

a small/proportional share of their interest calculated from 5/30 to the time they deposit their

purchase price into the account so we can pay down the loan" and that "Peter passed along the

signed wires so we will get that moving ASAP to stop the 'clock ticking' on the interest part."

Pl.'s ex. 7, pp. 124-25.

117.    On April 5, 2010, Defendant sent the following email to Mark Lefkow with

Shannan Collier copied:

> The Wachovia HELOC [Home Equity Line of Credit] reconciliation is complete and the attached reflects all transaction on that account.
> The RBC HELOC is more complicated and just draft.  It is obvious however that transactions went to either pay Georgian Bank interest or for the 1842 Capital loan . . . or went to myself/the businesses.
> There is capital in the businesses . . . and the intention is Winder would be paying half of the interest payment after 8/29/09 and I/my business interest could have easily continued to pay the other half of the interest payments until the bank stock sold . . . Winder then gets his half upon sale of the stock, I get my allocable share on 1.5 million and the Taylors get their allocable share on their $1 million. Would have worked very well sans the unforeseen demise of the bank.
> I attached the Winder interest agreement to refresh your memory.  Pl.'s ex. 13, p. 1 (omissions in original).

29

Defendant acknowledged sending this email during his testimony at trial.   Defendant

acknowledged preparing the Wachovia HELOC reconciliation that is referenced in this email and

part of Plaintiffs' exhibit 13.   Additionally, Defendant admitted to preparing the RBC HELOC

reconciliation that is referenced in this email and part of Plaintiffs' exhibit 13.

118.    On April 5, 2010, Defendant sent another email to Lefkow with Collier copied:

I am tracking down the status of the $950,000.  I am getting the bank to
provide me with copies of the checks . . . should have within 24 to 48 hours.
You can see payments TO the Apogee GBC 2008, LLC Wachovia account
and the payments OUT of the account.  I won't know until I get the check copies
exactly where I wrote those checks to.  BUT, they were likely either to my
personal RBC HELOC (Home Equity Line of Credit) or my personal Wachovia
HELOC.
I also gave you a reconciliation of the interest payments to Georgian.
They total $248,853.40.
SO, I have $700,000 that is "somewhere."  I am having the RBC and
Wachovia HELOC reconciled to see where I wrote monies from those account too
[sic] . . . but it would be either my personal accounts or to one of the companies.
I'll have more info for you directly.  Pl.'s ex. 13, p. 7 (omissions in
original).

Defendant admitted that he sent this email and that the email was sent to trace where the

$950,000 Plaintiffs paid to Apogee GBC 2008 went.  Defendant admitted during his testimony

that he commingled the funds with his personal accounts.  Defendant testified to preparing a

spreadsheet that is page 8 of Plaintiffs' exhibit E.  Defendant stated the spreadsheet was an

attempt to trace the $950,000 and was a reconciliation of Apogee GBC 2008's Wachovia bank

account.   The spreadsheet shows the $950,000 from Plaintiffs going into the account and

numerous checks written on the account ranging in dollar amounts from $30,063 to $160,000.

Defendant states in the above email the checks were likely to his personal RBC HELOC or

personal Wachovia HELOC.  Defendant also indicated he prepared page 9 of Plaintiffs' exhibit

E, which is a reconciliation of the $248,853.40 in interest payments on the Georgian Bank loan

referenced in the email.  Additionally, Defendant stated he prepared page 10 of Plaintiffs' exhibit

E, which is a timeline of when Apogee GBC 2008 received funds from Plaintiffs.

119.    Defendant admitted sending a third email on April 5, 2010, to Lefkow with

Collier copied:

> Attached is a reconciliation of all interest payments made on the 1842
> Capital, LLC loan.
> Unfortunately I made these payments from various personal accounts as
> opposed to having an 1842 Capital, LLC checking account.
> Total interest payments were $248,853.40.
> Big picture, $950,000 less $250,000 of interest payments = $700,000.
> That remaining $700,000 is/were commingled with other personal funds of mine
> and used in the various businesses (Apogee or the construction companies).  I'll
> send you the RBC HELOC and Wachovia HELCO [sic] reconciliations, but they
> get very confusing.  Pl.'s ex. 13, p. 13.

120.    Defendant testified to transferring funds from the RBC HELOC to his personal

checking account.  He testified the same occurred with respect to the Wachovia HELOC.

121.    The RBC HELOC reconciliation shows a July 29, 2008 transaction, which is a

$20,000 withdrawal to "Fidelis."    Defendant testified "Fidelis" was ATS Fidelis.    The

reconciliation also shows a December 19, 2008 transaction, which is a $30,000 withdrawal to

"AFO."  Defendant testified "AFO" was Apogee Family Office.  The reconciliation shows a July

24, 2008 transaction, which is a $35,000 withdrawal to "ATS."  Defendant testified "ATS" was

ATS Fidelis or ATS Electric.[12]  Pl.'s ex. 13, p. 5.

---

[12] Plaintiffs' exhibit 13 was admitted through the testimony of Shannan Collier, who
testified via deposition at trial.  Collier was Defendant's attorney for a period of time.  Defendant
objected to Collier's testimony on grounds of attorney-client privilege.  The Court overruled this
objection and found the privilege waived based on an email dated May 3, 2010, to Louis Cohan,
Mark Lefkow, and others, which states "[s]ince I have waived the attorney-client privilege with
Ms. Collier, attached are all emails FROM Ms. Collier to myself related to this matter.  I will be
forwarding all emails that I sent TO Ms. Collier in a few minutes."  Pl.'s ex. 13, p. 15.

   Prior to trial, Defendant moved to exclude Collier's deposition due to the absence of local
counsel for Plaintiffs at the deposition.  *See* D.S.C. Civ. R. 83.I.06 ("Unless excused by the
Court, the associated local counsel shall be present at all pretrial conferences, hearings and trials

122.   With everything that was occurring with his businesses, Defendant testified the last thing he would be strategizing about is how to take $950,000 from Plaintiffs.  Defendant also stated he has lost "a ton more than the $950,000" and does "not care about $950,000."

## CONCLUSIONS OF LAW

Plaintiffs assert Defendant owes a debt to them that is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).  A central purpose of the Bankruptcy Code "is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"  *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).  However, the Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'"  *Id.* at 286-87 (quoting *Hunt*, 292 U.S. at 244).  Section 523(a) of the Bankruptcy Code sets forth certain kinds of obligations that Congress deems to be nondischargeable.  *Id.* at 280-81.

As the party asserting a debt owed to them is nondischargeable, Plaintiffs bear the burden of proof, which is by a preponderance of the evidence.  *Id.* at 291.  In addressing exceptions to discharge, courts "traditionally interpret the exceptions narrowly to protect the purpose of providing debtors a fresh start" but "are equally concerned with ensuring that perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code."  *Foley & Lardner v.*

---

and may attend discovery proceedings.").  Defendant also objected on this basis at the deposition.  The Court does not find that Collier's testimony should be excluded based on the absence of Plaintiffs' local counsel at her deposition.  In addition, even if the Court had excluded Collier's testimony based on the absence of local counsel or the attorney-client privilege, the Court's conclusions in this Order would be the same because of Defendant's testimony regarding Plaintiffs' exhibit 13 and what he did with the $950,000.

*Biondo* (*In re Biondo*), 180 F.3d 126, 130 (4th Cir. 1999).  Given that section 523(a) is worded in the disjunctive, Plaintiffs only need to prove the applicability of one of its subsections.  *See* 11 U.S.C. § 523(a).

## A. 11 U.S.C. § 523(a)(2)(A)

Under 11 U.S.C. § 523(a)(2)(A), debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition" are not dischargeable.  "[F]alse pretenses, a false representation, or actual fraud" are "common-law terms, and . . . they imply elements that the common law has defined them to include." *Field v. Mans*, 516 U.S. 59, 69 (1995).  At the time section 523(a)(2)(A) was enacted in 1978 and now, "the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976), published shortly before Congress passed the [1978 Bankruptcy Reform] Act." *Id* at 70.  Likewise, the Fourth Circuit has referred to the Restatement in defining the tort of fraudulent misrepresentation and stated that to prevail under section 523(a)(2)(A), a plaintiff must establish five elements: "(1) that the debtor made a representation; (2) that at the time the representation was made, the debtor knew it was false; (3) that the debtor made the false representation with the intention of defrauding the creditor; (4) that the creditor justifiably relied upon the representation; and (5) that the creditor was damaged as the proximate result of the false representation." *Lind Waldock & Co. v. Morehead*, 1 Fed. Appx. 104, 107 (4th Cir. 2001) (citing *Biondo*, 180 F.3d at 134; *MBNA Am. v. Simos* (*In re Simos*), 209 B.R. 188, 191 (Bankr. M.D.N.C. 1997)).  Courts within the Fourth Circuit and other circuits have held that "a misrepresentation occurs when funds are entrusted to a debtor for a specific purpose, and the debtor has no intention of using the money for that purpose." *Elrod v.*

Bowden (*In re Bowden*), 326 B.R. 62, 83 (Bankr. E.D. Va. 2005) (citing cases); *see also In re Sheridan*, 57 F.3d 627, 635 (7th Cir. 1995) ("We have held that when a creditor entrusts the debtor with money to use for a specific purpose and the debtor has no intention of using it in that manner, a misrepresentation exists upon which a debt can be held non-dischargeable.  In other words, proof that the debtor never put the money toward the stated purpose allows a court to infer the requisite intent." (citing *Merchants Nat'l Bank & Trust Co. of Indianapolis v. Pappas* (*In re Pappas*), 661 F.2d 82, 86 (7th Cir. 1981)).

*1. False representation*

Based on the evidence presented, the Court finds that the debt Defendant owes to Plaintiffs is nondischargeable under section 523(a)(2)(A) based both on a false representation and a false pretense.   First, with respect to a false representation, Defendant made a representation in the June 11th email in which he stated:

> We had to go ahead and close the purchase on May 30th (using a loan from the bank in order to close it fast as you know), so we will end up having to "bill" folks a small/proportional share of their interest calculated from 5/30 to the time they deposit their purchase price into the account so we can pay down the loan. We are also asking people to sign (with us) for their portion of the note as a sign of good faith.  Pl.'s ex. 7, pp. 124-25.

He also wrote in this email that "[i]n any case . . . Peter passed along the signed wires so we will get that moving ASAP to stop the 'clock ticking' on the interest part . . . and we should have the IRA portion done in the next 3 or 4 weeks once Fidelity approves everything."  *Id.* (omissions in original).  At the time he made this representation, Defendant knew it was false.  Defendant testified he appeared on behalf of Plaintiffs when obtaining the loan from Georgian Bank and provided Plaintiffs' financial information to obtain the loan.  He did this even though Plaintiffs never gave him express authorization to obtain the loan.  Defendant also testified the loan to purchase the Georgian Bank was his idea and he was the only person who approached Georgian

Bank about the loan.  Therefore, Defendant knew as a part of the May 2008 note, he, Fairman, and supposedly Plaintiffs were signing guarantees for the whole $5 million loan.  Yet, he suggests in this email that Plaintiffs are only signing "for their portion of the note as a sign of good faith."  Defendant makes further misrepresentations regarding billing Plaintiffs for "a small/proportional share of their interest calculated from 5/30 to the time they deposit their purchase price into the account" so he can pay down the loan and "stop the 'clock ticking' on the interest part."  The evidence clearly shows Defendant used approximately $250,000 of the $950,000 provided by Plaintiffs to pay interest on the entire $5 million loan, not just Plaintiffs' portion of the loan.  Pl's ex. 13.  The remaining $700,000 was commingled in Defendant's personal accounts and used for his business or personal expenses.  *Id.*  In sum, the Court finds that Defendant knew the statements in his June 11th email about Plaintiffs' liability on the May 2008 loan and about how he was going to use Plaintiffs' money were false at the time he made the statements and that he had no intention to use Plaintiffs' money in the manner he indicated in the email.  *See Bowden*, 326 B.R. at 83.

The Court also finds that Defendant made the false representations in the June 11th email with the intention of defrauding Plaintiffs.  "Because direct proof of intent (*i.e.,* the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred."  *Caspers v. Van Horne* (*In re Van Horne*), 823 F.2d 1285, 1288 (8th Cir. 1987), *abrogated on other grounds, Grogan*, 498 U.S. at 291. There is ample evidence in the circumstances surrounding the transaction at issue to support a finding Defendant intended to defraud Plaintiffs when he made the statements in the June 11th email.  As an initial matter, he did not use the funds provided by Plaintiffs in the manner represented in the email.  Instead, he used the funds for his personal expenses, his businesses,

and for interest on the entire $5 million loan while Plaintiffs remained guarantors on the loan even though they paid $950,000 toward their $1 million investment.  He also misrepresented Plaintiffs' potential liability on the loan, which he structured less than two weeks before the June 11th email.   At a minimum, Defendant's statements regarding Plaintiffs' potential liability constitute false representations that he recklessly made and on which he knew or should have known Plaintiffs would rely and from which "intent to deceive may logically be inferred." *Household Fin. Corp. v. Kahler* (*In re Kahler*), 187 B.R. 508, 513 (Bankr. E.D. Va. 1995).  In addition, out of the four people who purportedly guaranteed the May 2008 note, Plaintiffs were the only ones with assets sufficient to pay a $5 million loan.[13]  Defendant admitted Fairman did not have assets to cover a $5 million loan, and there is no indication Defendant had assets to cover a $5 million loan.  It is improbable Georgian Bank would have agreed to such a loan without guarantors who could cover the loan.   Therefore, Defendant needed Plaintiffs' guarantees in order to obtain the loan to purchase the Georgian Bank stock.  Defendant used the guarantees Plaintiffs purportedly signed in May 2008 to leverage a loan to benefit himself and others.  While he paid no actual money for the stock, aside from perhaps $1,000, Defendant testified $1.5 million of the stock would be allocated to the Apogee Companies, and undoubtedly he and others within those companies would expect to see a return on that $1.5 million worth of stock.[14]  In the end, Defendant structured a $5 million loan that benefited himself and others and that had Plaintiffs as guarantors for the full amount of the loan even though the loan only benefited them to the extent of their $1 million investment and even though they intended to pay

---

[13] The same is true of the August 2008 note.

[14] In an email to Lefkow, Defendant stated he expected to see a return on $1.5 million. *See* Pl.'s ex. 13, p. 3.  It is, thus, unclear whether $1.5 million of the stock was allocated to himself or the Apogee Companies.  Regardless, he expected to see a significant return on the transaction.

for their investment and did so to the extent of $950,000. Defendant provides no credible

explanation for structuring the transaction in this fashion other than simply stating there was no

discussion about only having people liable on the loan for the amount of their investment until

they paid for their investment.[15]  He also provides no credible explanation for why he used the

$950,000 for a purpose other than that for which it was given to him. *See Bowden*, 326 B.R. at

87 ("[O]nce a creditor has provided circumstantial evidence giving rise to this intent, a debtor

cannot overcome the inference by making unsupported assertions of honest intent."). That

Defendant may have believed in May and June of 2008 that the odds of Georgian Bank failing

and the guarantees being enforced were "1 in a million" and an "insane scenario of events" does

not negate this Court's finding that he acted with fraudulent intent. *See* Pl.'s ex. 15, 16; *see also*

*Murray v. Nassbridges* (*In re Nassbridges*), 434 B.R. 573, 588-89 (Bankr. C.D. Cal. 2010)

("Debtor took the Murrays' money on one set of assumptions and then invested it under an

entirely different set. Even professional gamblers may think they are sophisticated or nimble

enough to beat the house every time, but they only have the right to lose their own money, not

other peoples' money absent clear and informed consent to play the game."); *Dubois v. Lindsley*

(*In re Lindsley*), 388 B.R. 661, 669 (Bankr. D. Md. 2008) ("Viewed through that prism, the

Court finds that Debtor's representation and subsequent actions establish that he took Plaintiffs'

---

[15] Defendant asserted the Fifth Amendment when asked in a deposition taken in the FDIC-R action whether he brought the May 2008 and August 2008 loan guarantees purportedly signed by Plaintiffs to Georgian Bank to induce it to lend $5 million and to renew the $5 million loan. "In a civil proceeding, a fact-finder is entitled to draw adverse inferences from a defendant's invocation of the privilege against self incrimination." *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002). At trial, Defendant stated he asserted the Fifth Amendment based on the advice of counsel. Without elaboration, Defendant also testified he thought asserting Fifth Amendment would help Plaintiffs. Even without drawing this adverse inference as impeaching Defendant's testimony at trial, the Court finds ample evidence of intent.

property through subterfuge and secrecy with the intent (and hope) that his scheme would remain undiscovered.").

Further evidence of Defendant's fraudulent intent exists in what transpired after June 11, 2008. Plaintiffs' purported signatures appear on guarantees dated August 29, 2008. Andrew Taylor testified that he was in Europe in the Alps with his daughter and a friend on August 29, 2008, and that Naomi Taylor was in southern Georgia with her daughter. Again, Defendant provides no credible explanation for why he would structure a transaction under which Plaintiffs are guarantors of a $5 million note when their investment was only $1 million, particularly considering that by August 2008, Plaintiffs had paid $500,000 toward their investment and were in the process of paying the rest. *See* Def's ex. I, J; Pl.'s ex. 13, pp. 8, 10.

Additional evidence of Defendant's intent to defraud Plaintiffs is contained in his communications with them after they received past due notices about the loan and after he told them they had signed guarantees on the loan at their August 20, 2009 meeting. Andrew Taylor requested documentation regarding the loan in emails dated August 20, 2009 and September 10, 2009. *See* Pl.'s ex. 15; Def.'s ex. M, p. 189. Defendant never personally responded with this documentation, although Plaintiffs received copies of the guarantees they purportedly signed with the demand letter sent by the bank. In his emails to Plaintiffs following the August 20th meeting, Defendant repeatedly indicated his desire that they rely on him to protect their interests and to obtain their release from potential liability on the loan. In doing so, he acknowledged Plaintiffs should not have been guarantors on the loan. *See* Pl.'s ex. 16. He reacted angrily when Plaintiffs retained legal counsel to protect their interests and to investigate Defendant's actions, including threatening to quit and leave Plaintiffs on their own unless they withdrew the Fulton County action against him without prejudice and wait to re-file until after January 1, 2010, if the

matter was not resolved by then.  Pl.'s ex. 20.  In his October 30, 2009 email, he makes several

hostile statements, including "[g]et ready, these people are going to go after/sue YOU for this

overreaching invasion of privacy and I will help them do that full time!!!" and "I will tell

EVERYONE to go work for [a friend Defendant states is interested in merging his business with

Apogee] and Apogee will be worth ZERO . . . thus I have zero and you get zero help and have to

deal with the bank by yourself!!!"  Pl.'s ex. 21, pp. 2-3 (omission in original).   Indeed,

Defendant's emails during this time easily can be characterized as attempting to intimidate

Plaintiffs into relying on Defendant to resolve the situation rather than relying on their attorney.

Plaintiffs largely complied with Defendant's demands, dismissed the Fulton County action

without prejudice, and then refiled their lawsuit against Defendant in Cobb County in April

2010.   Defendant still did what he threatened, as he testified that he stopped operating the

Apogee Companies and essentially bankrupted himself.

    The Court finds that Plaintiffs justifiably relied upon Defendant's representations in the

June 11th email.  There is no credible evidence Plaintiffs signed the May 2008 or August 2008

guarantees, and Defendant himself agreed the signatures on the guarantees are nowhere near

Naomi Taylor's actual signature.  Additionally, the Court finds Andrew Taylor's explanation in

his affidavit in support of his request to withdraw his admissions in the FDIC-R action credible.[16]

*See* Def.'s ex. Q.  Plaintiffs thus did not know there were guarantees with their purported

---

[16] Although the order in the FDIC-R action allowing Plaintiffs' to withdraw their
admissions was never introduced into evidence, both parties described the order at length,
including that it expressed suspicion about Plaintiffs' request.  However, the court ultimately
granted Plaintiffs' motion to withdraw their admissions.  Furthermore, this Court's finding of
credibility in Andrew Taylor's explanation is after a complete trial on the merits during which
Plaintiffs and Defendant testified whereas the order in the FDIC-R action was at an interlocutory
stage of that proceeding.  Additionally, the fact that Naomi Taylor also initially admitted to
executing the guarantees in the FDIC-R action suggests that Plaintiffs did not review their
signatures closely before responding to the requests for admission, given that everyone,
including Defendant, appears to agree that the signatures on the guarantees are not hers.

signatures on them at the time Defendant sent the June 11th email.  As a result, Plaintiffs were

justified in relying upon Defendant's statement suggesting that their liability on the loan used to

close the transaction quickly was limited to the $1 million they agreed to invest and that the

money they paid for the investment would be used to pay off their portion of the loan.

Moreover, while the wire transfer authorizations with Plaintiffs' signatures on them have a June

7, 2008 date printed at the top, they are accompanied by fax transmittal sheets with transmittal

dates of June 13, 2008, or June 23, 2008.  Def.'s ex. I, J.  Defendant testified these transmittal

dates represent the dates the Apogee Companies sent the wire transfer authorizations to Fidelity

to have the funds transferred from Fidelity to Apogee GBC 2008.  Defendants' own

reconciliations of funds received by Apogee GBC 2008 show a $150,000 wire transfer on behalf

of Naomi Taylor from Fidelity on June 13, 2008; a $200,000 wire transfer on behalf of Naomi

Taylor from Fidelity on June 23, 2008; and a $150,000 wire transfer on behalf of Andrew Taylor

from Fidelity on June 23, 2008.  Pl.'s ex. 13, pp. 8, 10.  Therefore, if Defendant had truthfully

stated in the June 11th email that Plaintiffs were guaranteeing the entire $5 million loan and that

he was going to use the money they paid for the Georgian Bank stock investment for his

businesses and personal expenses, Plaintiffs could have taken action to stop Fidelity from

transferring funds to Apogee GBC 2008 before the transfers occurred.  Instead, Plaintiffs took no

action to protect themselves and were unaware of their purported guarantees of a $5 million loan

until August 2009.

    *2. False pretense*

    Section 523(a)(2)(A) excepts from discharge debts for money to the extent obtained not

only by false representations but also by false pretenses.  "A false representation is an express

misrepresentation, while a false pretense refers to an implied misrepresentation or 'conduct

intended to create and foster a false impression.'"[17] *Nat'l Bank of N. Am. v. Newmark* (*In re Newmark*), 20 B.R. 842, 854 (Bankr. E.D.N.Y. 1982) (quoting *H.C. Prange Co. v. Schnore* (*In re Schnore*), 13 B.R. 249, 251 (Bankr. W.D. Wis. 1981)).    Thus, "[f]alse pretenses do not necessarily require overt misrepresentations.    Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Haeske v. Arlington* (*In re Arlington*), 192 B.R. 494, 498 (Bankr. N.D. Ill. 1996) (citing *Peterson v. Bozzano* (*In re Bozzano*), 173 B.R. 990, 993 (Bankr. M.D.N.C. 1994), *abrogated on other grounds, Cohen v. de la Cruz*, 523 U.S. 213 (1998)); *see Fleming v. Gordon* (*In re Gordon*), 491 B.R. 691 (Bankr. D. Md. 2013); *Lindsley*, 388 B.R. at 669; *O'Connor, CPO, Inc. v. Booker* (*In re Booker*), 165 B.R. 164, 169 (Bankr. M.D.N.C. 1994); *Nash-Bone v. Ramey* (*In re Ramey*), 454 B.R. 640, 645-46 (Bankr. E.D. Va. 2011); *Bowden*, 326 B.R. at 82-83; *Kendrick v. Pleasants* (*In re Pleasants*), 231 B.R. 893, 897-98 (Bankr. E.D. Va. 1999); *see also Bearden v. Jackson* (*In re Bearden*), 382 B.R. 911, 920 (Bankr. D.S.C. 2008) ("Furthermore, a false pretense requires some intentional act, either by affirmative representation or silence (with knowledge of the fact), on the part of the Debtor.").    Within the confines of the Restatement (Second) of Torts, this description of what constitutes a false pretense finds support in sections 550 and 551.    Most applicable here, section 551 provides that "[o]ne who fails to disclose to another a fact that he

---

[17] As for the term "actual fraud" in section 523(a)(2)(A), "the legislative history of section 523(a)(2)(A) indicates that the term . . . was included in that section, not to expand or define the manner of frauds that might fall within the operation of the non-dischargeability statute, but to clarify and emphasize the fact that only debts resulting from fraud intended to deceive, or frauds involving moral turpitude, are non-dischargeable, and not debts resulting from constructive fraud or fraud implied in law." *FCC Nat'l Bank v. Gilmore* (*In re Gilmore*), 221 B.R. 864, 871 (Bankr. N.D. Ala. 1998).    As one court has stated, "[t]he term 'actual fraud' in section 523(a)(2)(A) is, except to exclude constructive fraud from the operation of the statute, redundant, since it does not encompass or define any conduct or activity that was not otherwise encompassed within or defined by the terms 'false representation or false pretenses.'"    *Id.*

knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question."[18]   Restatement (Second) of Torts § 551 (1977); *see also AT&T Universal Card Serv. v. Mercer* (*In re Mercer*), 246 F.3d 391, 404 (5th Cir. 2001); *Citibank (S.D.), N.A. v. Eashai* (*In re Eashai*), 87 F.3d 1082, 1089 (9th Cir. 1996); *Van Horne*, 823 F.2d at 1288; *Demerdjian v. Thompson* (*In re Thompson*), 354 B.R. 174, 179 n.4 (Bankr. E.D. Tenn. 2006); *FCC Nat'l Bank v. Gilmore* (*In re Gilmore*), 221 B.R. 864, 872 (Bankr. N.D. Ala. 1998).   Section 551 lists a number of matters a party to a business transaction is under a duty to exercise reasonable care to disclose to the other party before the transaction is consummated:

> (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
> (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

*Id.*

    As an initial matter, Defendant was a fiduciary of Plaintiffs during the events in question under Georgia law.   *See* Ga. Code Ann. § 23-2-58 ("Any relationship shall be deemed

---

[18]  Section 550 deals with situations where "[o]ne party to a transaction . . . by concealment or other action intentionally prevents the other from acquiring material information."  Restatement (Second) of Torts § 550 (1977).

confidential, whether arising from nature, created by law, or resulting from contracts, where one

party is so situated as to exercise a controlling influence over the will, conduct, and interest of

another or where, from a similar relationship of mutual confidence, the law requires the utmost

good faith, such as the relationship between partners, principal and agent, etc.").  Defendant

prepared a will for Plaintiffs while he was at Stillpoint.  The Apogee Companies had access to

Plaintiffs' financial accounts and could pay bills from those accounts with Plaintiffs'

authorization.  Apogee also had access to Plaintiffs' IRA accounts and could withdraw fees for

Apogee's services from those accounts with Plaintiffs' authorization.  Plaintiffs repeatedly

testified they trusted Defendant in making their decision to invest in the Georgian Bank,

including trusting statements Defendant made in his May 21, 2008 email.  *See* Pl.'s ex. 2, pp. 70-

71.  Perhaps most indicative of a fiduciary relationship is the fact that Defendant testified he

appeared on Plaintiffs' behalf when obtaining the loan from Georgian Bank and provided

Plaintiffs' financial information without Plaintiffs' ever giving their express authorization to use

a loan to purchase the stock.  Plaintiffs never met with or spoke with Georgian Bank in

connection with obtaining the loan.  Further evidence of a fiduciary relationship exists in

Defendant's September 2009 emails describing Plaintiffs as "family," *see* Pl.'s ex. 16, 18, and in

Defendant encouraging Plaintiffs in his August through October 2009 emails to rely on him to

resolve the situation with the loan.  Indeed, Plaintiffs' trust in Defendant was so great that they

did not object to him using a loan to purchase the Georgian Bank stock even though they never

authorized a loan to purchase their allocable share and they believed him when he said they

signed guarantees at their meeting in August 2009, only to realize later they had not signed

guarantees.  Consequently, the Court finds Defendant's relationship with Plaintiffs was such that

there was a duty to speak.  *See* Restatement (Second) of Torts § 551.

The Court concludes that Plaintiffs' agreement to participate in the Georgian Bank stock purchase was the result of Defendant fostering a false impression by failing to disclose a fact that he knew may justifiably induce Plaintiffs to act or refrain from acting. The false impression was that Plaintiffs' risk was limited to the $1 million they agreed to invest, that their liability on the loan used to purchase their investment was limited to the amount needed to purchase their share of the stock, and that their liability on the loan would decrease as they paid for their investment. Defendant never disclosed to Plaintiffs that as part of the transaction they were guaranteeing a $5 million loan. Defendant's testimony that someone at sometime between May 29, 2008 and June 2, 2008 brought the guarantees to Plaintiffs for their signatures lacks credibility.[19] Defendant was not sure whether he brought the guarantees to Plaintiffs. Consequently, out of the witnesses who testified at trial, Plaintiffs were the only people with personal knowledge of whether someone brought them guarantees to sign, and they deny signing any guarantees. In addition, the notion that the guarantees were taken to and signed by Plaintiffs between May 29th and June 2d, thus making them aware they were guaranteeing a $5 million loan, is inconsistent with Defendant's statements in his June 11th email. Defendant states in this email that "we will end up having to 'bill' folks a small/proportional share of their interest calculated from 5/30 to the time they deposit their purchase price into the account so we can pay down the loan" and "we are also asking people to sign (with us) for their portion of the note as a sign of good faith." Pl.'s ex. 7, pp. 124-25. The email is written in a manner to foster Plaintiff's belief that they were only obligors on a loan to the extent of their $1 million allocable share of the stock and only until they paid for the stock. If $5 million guarantees were taken to Plaintiffs between May 29th and June

---

[19] It is questionable anyway whether simply sending someone to obtain Plaintiffs' signatures on $5 million guarantees when their investment was only $1 million constitutes exercising reasonable care to disclose the matter in question. *See* Restatement (Second) of Torts § 551.

2d for their signatures as Defendant asserts, then why did he make the statements set forth in the June 11th email, including that people were only being asked to sign "for their portion of the note as a sign of good faith."  Further, Defendant's suggestion that Plaintiffs being guarantors on the entire $5 million loan was all some big, innocent mistake lacks credibility.[20]

As for the other elements of 11 U.S.C. § 523(a)(2)(A), the Court finds Defendant created a false impression with intent to deceive for the same reasons discussed in connection with the false representations Defendant made in the June 11th email and based on the inconsistency between the June 11th email and Defendant's testimony that the guarantees were taken to Plaintiffs for their signatures.  The Court also finds Plaintiffs were justified in believing Defendant would disclose important details of the transaction to them, including that they would be guarantors of a $5 million loan.

### 3. Damage as the proximate result of the false representation and false pretense

The final element of section 523(a)(2)(A) is that Plaintiffs must have suffered damage as the proximate result of the false representation or false pretense.  Defendant moved for summary judgment prior to trial and for judgment as a matter of law at trial arguing that the Georgian Bank stock was worthless once the bank failed, meaning Plaintiffs still would have lost $950,000 even if he used the funds to purchase the stock.  However, the Court finds that Plaintiffs did suffer damage, potentially including but not limited to the $950,000 they paid to Apogee GBC

---

[20] The timeline of the transaction also weighs against the credibility of Defendant's testimony.  Defendant indicates in the May 30th and June 11th email that the closing of the stock purchase occurred on May 30, 2008, which suggests that the seller conveyed the stock to Apogee GBC 2008 on that date.  *See also* Def.'s ex. C.  It seems unlikely the seller would have conveyed the stock without receiving the purchase price and equally questionable that Georgian Bank would have released the funds to cover the purchase price without first having Plaintiffs' purported guarantees.  Defendant suggested the Apogee Companies' relationship with Georgian Bank was such that the bank was willing to wait until June 2, 2008, to receive those purported guarantees.

2008, which Defendant used for interest on the entire $5 million loan, for his businesses, and for his personal expenses.[21]  *See Cohen*, 523 U.S. at 223 ("In short, the text of § 523(a)(2)(A), the meaning of parallel provisions in the statute, the historical pedigree of the fraud exception, and the general policy underlying the exceptions to discharge all support our conclusion that 'any debt . . . for money, property, services, or . . . credit, to the extent obtained by' fraud encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor."(omissions in original)).  Plaintiffs testified they would not have participated in the investment in Georgian Bank if they had known about the $5 million guarantees and had known Defendant would use their $950,000 for his businesses and personal expenses.  If Defendant had made disclosures and been truthful to Plaintiffs about these matters, Plaintiffs would not have participated in the investment or transferred $950,000.  Similarly, if Defendant had been truthful in the June 11th email, Plaintiffs could have taken action to stop the transfer of funds to Apogee GBC 2008 and notified Georgian Bank that they had not signed guarantees for a $5 million loan, thus taking steps to extricate themselves from the situation before having to defend a lawsuit brought to enforce the guarantees.[22]

---

[21] The Court does not attempt in this Order to ascertain all of the damages proximately caused by Defendant's actions.  The Court merely finds that Plaintiffs were injured and suffered damages.

[22] A significant amount of the testimony at trial related to Plaintiffs' understanding of the role of Apogee GBC 2008 in the stock purchase, whether Plaintiffs knew Apogee GBC 2008 was more than a temporary holding entity, and at what point Plaintiffs knew about the existence of Apogee GBC 2008.  Additionally, Defendant sought to impeach Plaintiffs' testimony on these issues through various emails, including the May 22, 2008 email with the information package attached about the Georgian Bank stock purchase, *see* Def.'s ex. B, and affidavits filed in this case on January 23, 2013, in which Plaintiffs make statements regarding their lack of knowledge of Apogee GBC 2008's role in the transaction and what effect full knowledge of that role would have had on them, *see* Def.'s exs. V, W.  In the end, the Court does not find that Plaintiffs relied on or that any damages were proximately caused by any statements Defendant made regarding

**B. 11 U.S.C. § 523(a)(4)**

Plaintiffs also allege the debt owed to them is nondischargeable under 11 U.S.C. §

523(a)(4), which excepts from discharge debts "for fraud or defalcation while acting in a

fiduciary capacity, embezzlement, or larceny."    "The language 'while acting in a fiduciary

capacity' does not qualify the word 'embezzlement' and therefore [a] court need not find that the

debtor was acting in a fiduciary capacity in order to hold the debt non-dischargeable on the

grounds of embezzlement."    *Gribble v. Carlton* (*In re Carlton*), 26 B.R. 202, 205 (Bankr. M.D.

Tenn. 1982).    "Embezzlement is generally defined under federal law as 'the fraudulent

appropriation of property by a person to whom such property has been intrusted or into whose

hands it has lawfully come.'"    *Id.* (quoting *Moore v. United States*, 160 U.S. 268, 269 (1895)).

"A creditor proves embezzlement by showing that he entrusted his property to the debtor, the

debtor appropriated the property for a use other than that for which it was entrusted, and the

circumstances indicate fraud."[23]    *Brady v. McAllister* (*In re Brady*), 101 F.3d 1165, 1173 (6th

Cir. 1996); *see also Booker*, 165 B.R. at 171.

---

Apogee GBC 2008's role as the holder of the Georgian Bank stock.  Even if Defendant had
explained more clearly that Apogee GBC 2008 was the owner of the stock because of regulatory
restraints on the number of shareholders Georgian Bank could have and that Plaintiffs were
receiving membership units in Apogee GBC 2008 which corresponded to their portion of the
Georgian Bank stock, the Court finds they still would have participated in the investment given
the level of trust they placed in Defendant at the time.

[23]    In the amended complaint, Plaintiffs allege under their factual allegations that
Defendant transferred $950,000 of Plaintiffs' money to his own use and benefit and that none of
Plaintiffs' money was used to purchase Georgian Bank stock.  In the section of the amended
complaint where they plead section 523(a)(4), Plaintiffs state "embezzlement" in the heading but
do not otherwise discuss the elements of embezzlement.  However, in their motion for summary
judgment, Plaintiffs clearly argued Defendant embezzled their money.  Docket # 172, pp. 10-11.
Defendant stated in his response to Plaintiffs' summary judgment motion that he "can
categorically state (*without infringing on his Fifth Amendment assertions*) that he NEVER had
custody and control over any of Plaintiffs['] money at any time, EVER."  Docket # 186, p. 7.
Plaintiffs also indicated in their pretrial order that one of the facts which remained to be litigated
was whether Defendant embezzled Plaintiffs' money.  Docket # 183, p. 1.  Therefore, the Court

The Court finds that the debt owed to Plaintiffs is nondischargeable under section 523(a)(4) based on embezzlement.   Plaintiffs entrusted $950,000 to Defendant with the understanding that it would go towards paying down the loan used to purchase Plaintiffs' share of the Georgian Bank stock.   Defendant used the funds for interest on the entire $5 million loan, for his businesses, and for personal expenses.   Moreover, as explained in connection with the Court's finding of nondischargeability under section 523(a)(2)(A), the circumstances under which Plaintiffs agreed to participate in the Georgian Bank stock purchase and transfer $950,000 to Apogee GBC 2008 indicate fraud.   Therefore, each element of embezzlement is met, and the debt is excepted from discharge under section 523(a)(4).   Given that the Court finds embezzlement applies, it is not necessary to decide whether Defendant was acting in a fiduciary capacity for purposes of section 523(a)(4) during the events in question.[24]

## C. 11 U.S.C. § 523(a)(6)

Plaintiffs assert they are owed a debt that is nondischargeable under 11 U.S.C. § 523(a)(6), which excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or the property of another entity."   "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."   *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).   "An act is 'malicious' within the meaning of § 523(a)(6) if wrongful and without just cause or excuse."   *Thompson v. Myers* (*In re Myers*), 235 B.R. 838, 842 (Bankr. D.S.C. 1998).

---

finds Defendant had notice that Plaintiffs were asserting the debt owed to them is nondischargeable based on embezzlement. *See also* Fed. R. Civ. P. 15(b)(2); Fed. R. Bankr. P. 7015.

[24] While the Court finds Defendant was a fiduciary under Georgia law, a different standard applies to determining whether someone is a fiduciary for purposes of section 523(a)(4).

The Court finds that Debtor's conduct in misrepresenting to Plaintiffs that he would use the funds they paid Apogee GBC 2008 to pay for their portion of the loan utilized to purchase the Georgian Bank stock and then using those funds for interest on the entire $5 million loan and for his personal expenses while Plaintiffs remained guarantors of the loan constitutes a willful and malicious injury for which the resulting debt is nondischargeable under section 523(a)(6).

## **<u>CONCLUSION</u>**

At trial, Defendant stated he wanted an impartial opinion as to whether he had engaged in any wrongful acts. The Court hopes this Order provides some guidance. Simply stated, with respect to Defendant's dealings with Plaintiffs described herein and the debt related thereto, Defendant does not fall within the category of an "'honest but unfortunate'" debtor for whom the Bankruptcy Code was enacted to provide a fresh start. *Grogan*, 498 U.S. at 286-87 (quoting *Hunt*, 292 U.S. at 244). This Court has not endeavored to determine the amount of the debt Defendant owes to Plaintiffs. However, there is a nondischargeable debt related to Defendant's conduct.

For the reasons set forth herein, it is therefore ORDERED that:

1.    Defendant owes Plaintiffs a debt that is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6);

2.    Defendant's motion entered February 14, 2013, to exclude Carney's testimony, deposition, transcript, and report and motion entered March 6, 2013, to reconsider this Court's Order denying Defendant's motion for a protective order regarding Plaintiffs' deposition of Carney are moot;

3.       Defendant's motion to exclude the trial depositions of Carney and Collier due to absence of local South Carolina counsel entered March 14, 2013, is moot to the extent it seeks to exclude Carney's deposition and denied to the extent it seeks to exclude Collier's deposition;

4.       Defendant's emergency motion to dismiss entered March 22, 2013, is denied;

5.       Defendant's motion for judgment as a matter of law because Plaintiffs suffered no damages is denied; and

6.       Defendant's motion for judgment as a matter law on Plaintiffs' 11 U.S.C. § 523(a)(4) cause of action because Defendant was not acting in fiduciary capacity is moot.[25]

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**07/26/2013**



Entered: 07/26/2013

David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina

---

[25] Prior to trial, in addition to arguing Plaintiffs suffered no damages and he did not act as a fiduciary, Defendant moved for summary judgment asserting that no debt exists because the claims alleged in the Cobb County action were compulsory cross-claims in the FDIC-R action. The Court denied the motion, and Defendant did not move for judgment as a matter of law on this basis at trial.